UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                    Case No. 12-20459
                                                    Honorable Thomas L. Ludington

v.

ANTHONY BENNETT,

                Defendant.

_____/

**OPINION AND ORDER DENYING MOTION TO TRANSFER VENUE**

"The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. People of State of Colorado ex rel. Attorney Gen. of State of Colorado*, 205 U.S. 454, 462 (1907). With these words, Justice Holmes, underscored the importance of an impartial jury—a right grounded in the Sixth Amendment. *See Skilling v. United States*, 130 S. Ct. 2896, 2912–13 (2010). Anthony Bennett believes that negative, prejudicial media coverage will prevent him from receiving an impartial jury (or a fair trial) in the Northern Division of the Eastern District of Michigan. So he has asked that venue be transferred to the Southern Division. But this is not the "extreme case" to which "[a] presumption of prejudice" attends. *Id*. at 2915. Bennett's motion to transfer venue will be denied.

**I**

During the summer of 2012, Bennett lived with his girlfriend, Jaimee Chamberlain, and her son, Carnel Chamberlain, on the Saginaw Chippewa Reservation in Mt. Pleasant, Michigan. Bennett is a member of the Saginaw Chippewa Native American Tribe. On June 21, 2012,

Bennett was reportedly babysitting Carnel, who was four years old at the time, while Jaimee was at work. Late that evening, Bennett allegedly called Jaimee and indicated that he could not find Carnel. Jaimee rushed home, the tribal police were contacted,[1] and a search for Carnel was initiated. On June 28, 2012, police discovered what they identified as Carnel's remains buried under the porch of Bennett and Jaimee's home. Def.'s Mot. 2, ECF No. 21. The remains were described as badly burned and unrecognizable. *Id*.

That same day, a criminal complaint was filed charging Bennett with assault of a child under sixteen resulting in substantial bodily injury. A grand jury indictment was returned on July 11, 2012 charging Bennett with the same crime. Then, four months later, a first superseding indictment was returned. Therein, Bennett was charged with murder in the first degree, assault of a child resulting in substantial bodily injury, assault of a child, assault with a dangerous weapon, animal cruelty, and two counts of witness tampering. *See* First Super. Indictment 1–4, ECF No. 11.

Trial is set to commence on January 14, 2014. On July 15, 2013, Bennett filed a motion to transfer venue. Emphasizing his Sixth Amendment rights and Federal Rule of Criminal Procedure 21, Bennett claims that he "cannot get a fair trial" in this Court. Def.'s Mot. 1–2. He cites pervasive, negative media attention as the basis of his concern. To alleviate his concerns, Bennett requests that venue be transferred to the Southern Division; specifically, the Theodore Levin United States Courthouse in Detroit.

## II

### A

Federal Rule of Criminal Procedure 18 sets forth the following:

---

[1] The Court is currently unaware of who contacted the police (whether Jaimee, Bennett, or someone else).

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

Fed. R. Crim. P. 18.   In conjunction with Rule 18, Federal Rule of Criminal Procedure 21 establishes that "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  Fed. R. Crim. P. 21(a).  Rule 21 further provides that "[a] motion to transfer may be made at or before arraignment or at any other time the court or these rules prescribe."  Fed. R. Crim. P. 21(d).  When Bennett indicated his intention to bring a motion to transfer venue, the Court directed that it be filed on or before July 15, 2013.  Bennett complied with that directive, and his motion is therefore timely.

Due process requires that a defendant receive a fair trial by an impartial jury free from outside influences.  *Patterson*, 205 U.S. at 462; *Morgan*, 504 U.S. at 727.  A motion to transfer venue because of jury prejudice may be based on "presumed" prejudice as well as "actual" prejudice.  *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998).  Bennett's motion comes under the former standard.  *See* Def.'s Mot. 9 ("Defendant's instant motion is for a change of venue based on 'presumed' prejudice.").

## B

Initially, it is worth emphasizing that Bennett does not ask that venue be transferred from the Eastern District of Michigan to one of the other 93 federal judicial districts.  Instead, Bennett only suggests that venue should be transferred from the Northern Division of the Eastern District

- 3 -

of Michigan to the Southern Division.[2]   That this case is pending in Bay City—rather than
Detroit, Flint, Port Huron, or Ann Arbor—stems from an interesting historical circumstance that
bears mentioning.

Prior to April 30, 1894, the Eastern District of Michigan existed as one single division.
*See* David Gardner Chardavoyne, *The United States District Court for the Eastern District of
Michigan: People, Law, and Politics* 128–29 (Charles K. Hyde et al. eds., 2012).   But the
counties of Northern Michigan—due to the lumber from their vast white-pine forests—were
"booming both economically and in population growth," *id.* at 125, and a federal court closer
than Detroit was necessary to serve the populous.

After much lobbying, on April 30, 1894, Congress enacted a statute "creat[ing] the
Northern and Southern Divisions of the Eastern District of Michigan." *Id.* at 129.   According to
David Chardavoyne, the "key provision" of this legislation for "the people living in the Northern
Division were the requirements that all cases arising in the Northern Division must be tried in
Bay City using jurors residing in the Northern Division[.]" *Id.* at 129–130.   Pursuant to this
legislation, the Southern Division comprises 13 counties[3] and the Northern Division comprises
21 counties.[4]

Thus, creation of the two divisions was to provide the citizens of counties in Northern
Michigan a federal court close to home and juries comprised of members from their community.

---

[2] While Rule 21 only contemplates inter-district transfer, *see* Fed. R. Crim. P. 21(a)–(c), and although there
is no constitutional or statutory right to proceed in one division of a district rather than another, *see United States v.
Erwin*, 71 F.3d 218, 220 (6th Cir. 1995) (collecting cases), *vacated for rehearing en banc on other grounds*, 78 F.3d
232 (6th Cir. 1996), at least two circuit courts have recognized intra-district transfers under the Federal Rules of
Criminal Procedure. *See Nanninga v. Three Rivers Elec. Co-op.*, 236 F.3d 902, 906 (8th Cir. 2000); *United States v.
Burns*, 662 F.2d 1378, 1382 (11th Cir. 1981).

[3] Genesee, Jackson, Lapeer, Lenawee, Livingston, Macomb, Monroe, Oakland, Saint Clair, Sanilac,
Shiawassee, Washtenaw, and Wayne counties. *See* 28 U.S.C. § 102(a)(1).

[4] Alcona, Alpena, Arenac, Bay, Cheboygan, Clare, Crawford, Gladwin, Gratiot, Huron, Iosco, Isabella,
Midland, Montmorency, Ogemaw, Oscoda, Otsego, Presque Isle, Roscommon, Saginaw, and Tuscola counties. *See*
28 U.S.C. § 102(a)(2).

And because the crimes alleged here happened within the Northern Division, the case comes to court in Bay City. *See* E.D. Mich. LCrR 18.1(a) (establishing that criminal cases are assigned to the "court which serves the county in which the offense is alleged to have been committed").

## 2

While the interplay of legislation and Rule 18 governs the division in which this case proceeds, the reason Bennett's case is in federal court is also noteworthy. This happenstance involves both the Saginaw Chippewa Indian Tribe of Michigan, to which Bennett belongs, and the Major Crimes Act (MCA), 18 U.S.C. § 1153.

The Saginaw Chippewa Tribal Nation is a band of Chippewa Indians located in central Michigan. *See Saginaw Chippewa Indian Tribe*, EMCOG.org, http://www.emcog.org/SiteDoc.asp?doc=SagChip.htm (last visited August 20, 2013). The Saginaw Chippewa Tribal Council is based out of the Isabella Indian Reservation, located in Isabella County. The reservation's total land area is approximately 217 square miles, with a population (as of the 2010 census) of 26,274 residents.[5] Based on 2000 census data (for which the Isabella Reservation boasted a population of 25,838), a total of 30,762 residents lived on Indian Reservations in Michigan.[6] Thus, almost 84 percent of all of Michigan residents living on Indian Reservations reside on the Isabella Reservation, where Bennett lived with Jaimee and Carnel.

Also relevant here, the MCA "permits the federal government to prosecute Native Americans in federal courts for a limited number of enumerated offenses committed in Indian

---

[5] *See Isabella Indian Reservation*, Wikipedia.org, http://en.wikipedia.org/wiki/Isabella_Indian_Reservation (last visited August 20, 2013).

[6] *See Population of Indian Reservations*, Michigan.gov, http://www.michigan.gov/documents/indiancountry_31994_7.pdf (last visited August 21, 2013).

country[.]"  *United States v. Other Medicine*, 596 F.3d 677, 680 (9th Cir. 2010).  The MCA states in full:

> (a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.
>
> (b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

18 U.S.C. § 1153.  Indian country includes "all land within the limits of any Indian reservation." 18 U.S.C. § 1151(a).  The Act originally allowed for prosecution of seven offenses.  *See United States v. Tyndall*, 400 F. Supp. 949, 950–51 (D. Neb. 1975).  Congress has added other crimes over time, so that the MCA now covers those outlined above.  It is the operation of this Act, along with offenses Bennett is accused of, that brings this action into federal court.[7]

### III

### A

In March 2010, the Supreme Court handed down its decision in *Skilling v. United States*, the seminal case concerning the appropriateness of a venue transfer.  The case involved Jeffrey Skilling—the infamous Chief Executive Officer of the Enron Corporation—and his trial for crimes committed before Enron's collapse into bankruptcy.

---

[7] Because the MCA only concerns crimes committed by Indians within Indian Country, the First Superseding Indictment makes note of the fact that Bennett is "an Indian," and that the alleged crimes occurred on the "Isabella Reservation" which is "within Indian country, as defined in 18 U.S.C. § 1151[.]"  First Super. Indictment 1, 2, 3.

Skilling was tried before a District Court in Houston, Texas. Because Enron was headquartered in Houston, Skilling moved to transfer the trial to another venue, contending that "hostility toward him in Houston, coupled with extensive pretrial publicity, had poisoned potential jurors." *Skilling*, 130 S. Ct. at 2908. To support his assertion, Skilling submitted, among other things, "hundreds of news reports detailing Enron's downfall[.]" *Id*. Noting that the media coverage had been mostly "objective and unemotional," and that the facts of the case were "neither heinous nor sensational," the District Court denied the motion to transfer. *Id*. (citation omitted). After a four-month trial, Skilling was convicted on 19 counts of criminal conduct, and was subsequently sentenced to 292 months' imprisonment, 3 years' supervised release, and $45 million in restitution.

Skilling appealed his conviction and sentence, and the case made its way to the Supreme Court. There, Skilling continued to argue that proceeding in Houston violated his right to a fair trial. The Supreme Court addressed two distinct questions: "First, did the District Court err by failing to move the trial to a different venue based on a presumption of prejudice? Second, did actual prejudice contaminate Skilling's jury?" *Id*. at 2912. Because Bennett's jury has yet to be empanelled, only the initial question is relevant here, and only the related analysis will be discussed.

In assessing whether Skilling had demonstrated a "presumption of prejudice" which necessitated a transfer of venue, the Court addressed four factors: (1) the size and characteristics of the community in which the crime occurred (and accordingly, from which the jury was selected); (2) whether there was dissemination of prejudicial information that "readers or viewers could not reasonably be expected to shut from sight"; (3) the lapse of time between the conduct and the trial itself; and (4) "of prime significance," the actual jury verdict. *Id*. at 2915–16.

Again, because Bennett's trial has yet to occur, only the first three considerations are relevant here.

The *Skilling* Court concluded that the potential jury pool (4.5 million individuals residing in the Houston area) was a "large, diverse pool," rendering "the suggestion that 12 impartial individuals could not be empaneled . . . hard to sustain." *Id*. at 2915. And "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information" that the public could not reasonably be expected to ignore. *Id*. at 2916. Moreover, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and the Court noted that "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id*. Finally, because Skilling was acquitted of nine insider-trading counts, there was "no overwhelming victory for the Government," which undermined the supposition of juror bias. *Id*. Persuaded that no presumption of prejudice existed, the Court concluded that the decision to deny the motion to transfer venue "did not exceed constitutional limitations." *Id*. at 2917. Indeed, the Court emphasized that "[a] presumption of prejudice . . . attends only the extreme case." *Id*. at 2915.

**B**

Before applying the *Skilling* factors to this case, one issue must be addressed: namely, what standard governs the inquiry. In his reply brief, Bennett argues that the Court "should apply the 'reasonable likelihood' standard . . . in deciding the issue." Def.'s Reply 2 (citing *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966)), ECF No. 26. In other words, if there is a reasonable likelihood that prejudice exists, Bennett believes venue should be transferred. In at least two cases the Court has located (other than *Sheppard*), courts have drawn distinctions between "presumed prejudice" and a "reasonable likelihood of prejudice." In *United States v.*

*Washington*, 813 F. Supp. 269 (D. VT. 1993), the court indicated that "[w]here a presumption of prejudice does not apply, a court should transfer venue in cases where there is a reasonable likelihood that pretrial publicity will be so prejudicial as to prevent a fair trial." *Id*. at 271–72 (citations omitted).   Similarly, in *United States v. Maldonado–Rivera*, 922 F.2d 934 (2d Cir. 1990), the Second Circuit established that "[i]n order to prevail on a motion under Rule 21(a), the defendant must show a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial." *Id*. at 966–67 (internal quotation marks and citation omitted).

But a "reasonable likelihood" of prejudice is not the benchmark embraced only three years ago by the Supreme Court in *Skilling*.   Indeed, the phrase "reasonable likelihood" does not appear in the opinion.   Instead, the Court determined that because "no presumption [of prejudice] *arose*," the district court "did not exceed constitutional limitations" in declining to order a venue change.   *Skilling*, 130 S. Ct. at 2917 (emphasis added).   Accordingly, transferring venue before trial is constitutionally mandated not when a "reasonable likelihood" of prejudice exists, but rather, when prejudice can be presumed.

This conclusion comports with the language of Rule 21 itself.   Rule 21 provides that "the court must transfer the proceeding . . . if the court is satisfied that so great a prejudice against the defendant *exists* in the transferring district that the defendant cannot obtain a fair and impartial trial there."   Fed. R. Crim. P. 21(a) (emphasis added).   The legislature's employment of the word exist—which Webster's Third International Dictionary defines as "to have real being whether material or spiritual: have being in space and time," Webster's Third New International Dictionary 796 (Unabridged ed. 2002)—requires that prejudice "have real being"; not that it is "reasonably likely" to arise.   Bennett's argument is without merit, and the Court will transfer venue only if prejudice can be presumed.

- 9 -

**C**

Turning now to the three relevant *Skilling* factors.  As to the first factor, Bennett contends that "in contrast to the large metropolitan area from which Mr. Skilling's jury was drawn, the Northern [Division[8]] has at present an estimated population of only 866,459[.]"  Def.'s Mot. 11 (citation omitted).[9]  Further, Bennett argues that "most of the [Division] is comprised of small communities where events such as those underlying this case are rarer, and therefore more prominent and more closely followed, than one would expect in a major metropolitan area where crime is more ubiquitous and media coverage much more diluted."  *Id.*  He concludes that the Northern Division is no place for him to find an impartial jury.

In response to Bennett's first point, *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) (plurality opinion) is instructive.  There, the Supreme Court addressed a situation where a lawyer held a press conference after his client was indicted on criminal charges.  During the conference, the attorney indicated that his client was innocent and the true villains were "crooked cops."  *Id.* at 1059.  The attorney also attacked the prosecution's main witnesses: "I can tell you that one, two-four of them are known drug dealers and convicted money launderers and drug dealers; three of whom didn't say a word about anything until after they were approached by Metro and after they were already in trouble[.]"  *Id.*

---

[8]  At multiple points in his motion, Bennett uses the word district when presumably referring to the Northern Division.  *See*, *e.g.*, Def.'s Mot. 11 ("the Northern District has at present an estimated population of only 866,459 . . . .  Moreover, most of the District is comprised of small communities . . .").  Because he does not request transfer out of the Eastern District of Michigan—rather, only the Northern Division—the Court will assume Bennett's use of "district" in these contexts was in reference to the Northern Division.

[9]  Counsel determined this amount by adding together the 2012 population estimates for each of the 21 counties in the Northern Division.  (That information is available here: http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.)  The Court's assessment was consistent.

In determining whether the attorney's comments had prejudiced the proceedings, the Court paid particular attention to "the size of the community from which any potential jury venire would be drawn"—600,000 individuals.  *Id.* at 1044.  The Court concluded that this expansive jury pool reduced the possibility of prejudice.  *Id.*

Here, the estimated potential jury pool of approximately 866,000 is almost 50 percent larger than the 600,000 countenanced in *Gentile*.  While this is not the 4.5 million potential jurors in *Skilling*, it is a substantial number; one that has been recognized by the Supreme Court as reducing the possibility of prejudice.  *Skilling*, 130 S. Ct. at 2915 (citing with approval *Gentile*, 501 U.S. at 1044).  Consistent with the government's contention, the Court believes this number is "sufficient to empanel 12 impartial jurors."  Pl.'s Resp. 4, ECF No. 25.

To Bennett's second point, it is true that the Northern Division of the Eastern District of Michigan is less urban than the Southern Division; and indeed, less populated.  But that does not mean the residents of the Northern Division are unable to objectively assess the facts of a murder case because they are less accustom to violence.  Moreover, the evidence does not appear to corroborate Bennett's assertion that the Northern Division's smaller communities, distributed over a very large geographic area, have highlighted this case as a unique novelty.  Noted by the government in its response to Bennett's motion (and substantiated by the Court's own inquiry), an online search of the Cheboygan News returned zero stories involving Carnel Chamberlain,[10] while the same search of Detroit's NBC affiliate, WDIV, returned eight.[11]  Although, as Bennett emphasizes, not "every news outlet must carry the relevant events for presumptive prejudice to

---

[10] *See* http://www.cheboygannews.com/apps/pbcs.dll/search?q=carnel%20chamberlain (last visited August 1, 2013).

[11] *See* http://www.clickondetroit.com/page/search/pns-det/-/1719524/-/view/asSearch/-/87chfuz/-/index.html?provider=site&cx=partner-pub-1569153127812452%3A6n1nw8-otn0&cof=FORID%3A9&ie=ISO-8859-1&q=carnel+chamberlain&sortBy=maupublicationdate (last visited August 1, 2013).

be found[,]" Def.'s Reply 4, that some outlets boast zero articles on the topic certainly weighs against presuming prejudice.

The Court is confident individuals in the Northern Division are capable of impartially assessing the evidence to be presented in this case. An impartial jury of twelve can be found among the available 866,000 individuals; particularly with proper *voir dire* procedures in place. The size and characteristics of the community from which the jury will be selected do not favor transferring this case to Detroit.

**D**

Next, Bennett argues that the pretrial publicity "has been both pervasive and overwhelmingly adverse," and that the second "*Skilling* factor predominates in favor of granting [his] motion." Def.'s Mot. 11–12. The Court disagrees.

In *Skilling*, while addressing whether media coverage was "of the type readers or viewers could not reasonably be expected to shut from sight," the Court indicated that there was "[n]o evidence of the smoking-gun variety" to invite prejudgment of Skilling's culpability. *Skilling*, 130 S. Ct. at 2916. This was determined despite a co-defendant pleading guilty in the weeks before Skilling's trial and the fact that thousands of Houston residents were former Enron employees who "lost their jobs" and "saw their 401(k) accounts wiped out" because of his alleged conduct. *Id.* at 2911.

The Court decided that these circumstances, even accompanied by extensively negative media attention, were not enough to demonstrate presumed prejudice. Indicating that the media reports "contained no confession or other blatantly prejudicial information," *id.* at 2916, the Court emphasized that "juror exposure to news accounts of the crime," without more, does not "presumptively deprive[] the defendant of due process," *id.* at 2914 (ellipses omitted) (quoting

- 12 -

*Murphy v. Florida*, 421 U.S. 794, 798–99 (1975)).   The Court also made clear that "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*."   *Skilling*, 130 S. Ct. at 2914–15 (emphasis in original) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).   Indeed, as has long been recognized:

> [E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.

*Reynolds v. United States*, 98 U.S. 145, 155–56 (1878).   Accordingly, in the Sixth Circuit (and elsewhere), "[p]resumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community[.]" *Campbell v. Bradshaw*, 674 F.3d 578, 593 (6th Cir. 2012) (quoting *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007)).

But a carnival atmosphere does not pervade here.   The fact that media outlets in the Northern Division have depicted Bennett in a negative light does not mean presumptive prejudice necessarily results.   Only extreme cases involving information that potential jurors could not reasonably be expected to ignore—such as open confessions—betray prejudice. Nowhere among the media sources Bennett identifies, although not containing glowing reports of his contributions to society, is there blatantly prejudicial "evidence of the smoking-gun variety."

A recent article from M-Live Media Group,[12] published June 21, 2013 (one year after Carnel went missing), only mentions Bennett in passing: "In the hours after the body was discovered, police arrested Anthony Bennett . . . who was babysitting the boy when he disappeared.   Bennett has been charged in the boy's killing, though delays have stalled a trial."

---

[12] "Michigan's largest local media organization."   *See* http://www.mlivemediagroup.com/.

Brad Devereaux, *One Year Later: Carnel Chamberlain's Family To Plant Tree Where Body Was Found*, June 21, 2013, *available at* http://www.mlive.com/news/saginaw/index.ssf/2013/06/one_year_later_carnel_chamberl.html (last updated June 21, 2013).

Most of the articles Bennett highlights mention that he has been charged with Carnel's murder, and many reference the pending motion to transfer venue or other routine proceedings in the case.   One article, however, contained this information: "Jaimee Chamberlain told investigators she witnessed Bennett choke, punch and drag her son on at least two occasions in May and June 2012.   The charge of assault with a dangerous weapon that Bennett faces stems from him attacking his girlfriend with a baseball bat, court records show."   Cole Waterman, *Anthony Bennett, Charged With First-Degree-Murder In Death Of 4-year-old, To Have Plea Hearing*, March 20, 2013, *available at* http://www.mlive.com/news/bay-city/index.ssf/2013/03/anthony_bennett_charged_with_f.html (last updated March 21, 2013). But nowhere did the Court locate, and Bennett does not offer, any news articles identifying him as a killer, or articles overstepping the bounds of objective reporting.   As in *Skilling*, the articles are largely unemotional (although, admittedly, the factual allegations here are more heinous and sensational).   Nevertheless, nothing contained in the media reports is something that cannot be "shut from sight."   Reports that Bennett was "the prime suspect," that he was Carnel's caretaker, that he did not cooperate with police, and that he refused to take a polygraph do not constitute "smoking-gun evidence" that uniquely invites prejudgment of his culpability.[13]

---

[13] Bennett also provided numerous blog-cites advocating that he receive the death penalty.   However, these sources of information are even less prejudicial than media sources.  *See United States v. Agriprocessors, Inc.*, No. 08-CR-1324, 2009 WL 721715, at *4 (N.D. Iowa Mar. 18, 2009) ("The court has no way to know whether most of the comments on the Internet are written by potential jurors as opposed to minors, non-residents or other persons unable to serve on the jury.   Likewise, the court has no reason to believe the comments are widely read.").

Bennett's attempts to liken this case to *Irvin* are unpersuasive.  There, the prosecutor and police officials issued press releases (to a county of only 30,000) indicating that the defendant had "confessed to the six murders."  *Irvin*, 366 U.S. at 719–20.  Here, no confession has been broadcasted, which dramatically undermines *Irvin*'s applicability.

While allegations that Bennett previously abused Carnel are obviously more damning, even these alleged incidents do not rise to "an inflammatory, circus-like atmosphere."  *Campbell*, 674 F.3d at 594.  As the Supreme Court noted in *Skilling*, "[a] jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded."  *Skilling*, 130 S. Ct. at 2916 (quoting with approval from *United States v. Chagra*, 669 F.2d 241, 251–52 n.11 (5th Cir. 1982)).  Bennett has never admitted to abusing the boy.  Others' allegations that he did, although clearly negative in nature, can be "shut from sight" by a competent jury.  It is well-settled that pretrial publicity—"even pervasive, adverse publicity"—does not inevitably lead to an unfair trial.  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).

### E

Finally, Bennett argues that the 18-month lapse between investigation and jury selection "predominates in favor of granting" his motion.  Def.'s Mot. 12.  Once again, the Court is not persuaded.

Indeed, the Supreme Court has indicated that even when media sources are extensively adverse—instilling in the community a sense of outrage—if trial occurs "at a time when prejudicial publicity [is] greatly diminished" presumed prejudice is not to be found.  *Patton v.*

---

Moreover, internet comments are clearly the type of third-party opinions the Supreme Court has indicated a jury should have "no difficulty in rejecting[.]"  *Skilling*, 130 S. Ct. at 2916 (citation omitted).

*Yount*, 467 U.S. 1025, 1032 (1984).  In *DeLisle*, the Sixth Circuit emphasized that "a cessation of publicity for some period prior to trial will go a long way toward undoing the damage of a previous media blitz."  *DeLisle*, 161 F.3d at 385.  "That time soothes and erases is a perfectly natural phenomenon, familiar to all."  *Id.* (quoting *Patton*, 467 U.S. at 1034).  The court in *DeLisle* established that "a four-month lapse between the intense coverage and the time of trial" supported a decision to deny a motion to transfer venue.

Here, 18 months will fall off the calendar between the June 2012 investigation and the January 2014 trial.  And while the media continues to cover the case (primarily reporting on the ongoing proceedings), interest has waned.  For example, a search of M-Live Media Group returned 1,810 articles referencing Anthony Bennett.  Of those articles, only 193 were published since January 2013.  And among the 193 articles from the past seven months, more than half concern a different Anthony Bennett—the number-one-selection in June's 2013 NBA draft.[14] Time continues to pass, and the publicity surrounding the case continues to diminish.  So even if some original media "blitz" had created a presumption of prejudice (a proposition the Court rejects), decreased interest will "go a long way toward undoing [any] damage[.]"  *DeLisle*, 161 F.3d at 385.

Application of the first three *Skilling* factors demonstrates that this case is not of the exceptional variety where jury prejudice may be presumed.  Thus, Bennett's motion to transfer venue will be denied.  In order to combat the possibility of actual prejudice on the part of any empaneled jury, the Court anticipates *voir dire* adhering to the process set forth in *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991) and adopted in *Jackson v. Houk*, 687 F.3d 723, 733 (6th Cir.

---

[14] Anthony Bennett was selected by the Cleveland Cavaliers as the first pick in round one of the 2013 NBA draft.  *See* Hunter Felt, *NBA Draft 2013: No 1 Pick Anthony Bennett Was Only The First Surprise*, June 28, 2013, *available at http://www.theguardian.com/sport/2013/jun/28/nba-draft-number-one-anthony-bennett* (last visited August 2, 2013).

2012).  As noted in *Campbell*, "A searching *voir dire* of the prospective jurors is the primary tool to determine if the impact of the publicity rises to the level of actual prejudice."  *Campbell*, 674 F.3d at 593–94 (brackets and internal quotation marks omitted) (quoting *Ritchie v. Rogers*, 313 F.3d 948, 962 (6th Cir. 2002)).

### IV

Accordingly, it is **ORDERED** that Bennett's motion to transfer venue, ECF No. 21, is **DENIED**.

Dated: August 27, 2013                                             s/Thomas L. Ludington
                                                                            THOMAS L. LUDINGTON
                                                                            United States District Judge

<div style="border:1px solid black">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 27, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>